# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| MNM INVESTMENTS, LLC,<br><br>*Plaintiff,*<br><br>vs.<br><br>HDM, INC. and DEREK MCCLOUD,<br><br>*Defendants.* | Case No. 18-1267-EFM-KGG |

HDM, INC.,

        *Counterclaim-Plaintiff,*

v.

MNM INVESTMENTS, LLC,
KANSAS MOTORCYCLE WORKS, LLC,
and MATTHEW MOORE,

        *Counterclaim-Defendants.*

## MEMORANDUM AND ORDER

Plaintiff MNM Investments, LLC ("MNM"), through its affiliate and wholly owned subsidiary Kansas Motorcycle Works, LLC ("KMW"), is a manufacturer of high-end cruiser-style motorcycles under the "Big Dog Motorcycles" brand. Defendant HDM, Inc. ("HDM") sells Big Dog motorcycle parts and accessories primarily through an eBay storefront. From 2014 to 2017, the parties worked together to sell Big Dog motorcycles, parts, and accessories. After their relationship broke down, MNM filed this lawsuit asserting ownership in the Big Dog federal

trademark registrations and common law marks as well as certain design information necessary for manufacturing Big Dog parts and accessories. MNM defines this design information as "parts drawings, engineering drawings, or designs" (the "Designs"). MNM asserts claims for breach of contract, trademark infringement, and trademark counterfeiting against HDM. In response, HDM asserts counterclaims against MNM, KMW, and Matthew Moore, MNM's principal, for tortious interference with prospective business relations, declaratory judgment concerning the manufacture and sale of Big Dog parts, and declaratory judgment concerning noninfringement of trademarks.

This matter comes before the Court on MNM's Second Motion for Partial Summary Judgment (Doc. 160). MNM asks the Court to make three findings: (1) that MNM owns all of the Big Dog trademarks, including the common law marks; (2) that MNM is entitled to judgment on HDM's counterclaim for declaratory judgment as to the right to manufacture parts and accessories; and (3) that MNM is entitled to judgment on HDM's counterclaim for tortious interference with prospective business relations. For the reasons discussed below, the Court grants in part and denies in part MNM's motion.

## I.      Factual and Procedural Background[1]

### A.      Old Big Dog's Business and Foreclosure

The "Big Dog Motorcycles" brand was originally owned by Big Dog Motorcycles, LLC ("Old Big Dog") under the ownership of Wichita-businessman Sheldon Coleman. From 1994 to 2011, Old Big Dog sold thousands of Big Dog-branded motorcycles, parts, and accessories. Old Big Dog also obtained federal trademark registrations for its "Big Dog Motorcycles, LLC,"

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

"BDM," and "BDM Performance Products" marks (the "Registered Marks") and owned a number of unregistered common law marks (the "Common Law Marks") (collectively, the "Big Dog Marks").[2]  Matthew Moore, a principal of MNM, served as Old Big Dog's director of marketing.

In 2011, Old Big Dog's business failed, and its lender, Intrust Bank, N.A. ("Intrust"), foreclosed on its loans to Old Big Dog.  Intrust possessed a security interest in certain physical and intangible assets of Old Big Dog.  On April 5, 2011, Old Big Dog conveyed its property to Intrust, so Intrust could dispose of and liquidate the assets as partial satisfaction of Old Big Dog's indebtedness.  The next day, Intrust conveyed certain assets to two entities associated with Old Big Dog—Motorcycle Enterprises, LLC, and Wichita Motorcycles, LLC.[3]  To Motorcycle Enterprises, Intrust conveyed the tangible assets associated with the business as well as the trademarks and copyrights associated with the  "BDM" and "BDM Performance Products" marks. To Wichita Motorcycles, Intrust conveyed the remaining trademarks, including the registered "Big Dog Motorcycles" mark, the patents, copyrights, and other intellectual property used in connection with the Big Dog business, and certain motorcycle prototypes.

On November 18, 2013, in connection with the foreclosure, Intrust and Moore agreed that Moore would act as a liquidator of the foreclosed assets.  In exchange for this service, Intrust agreed to provide Moore ten percent of the proceeds of the assets sold and the intellectual property held by Wichita Motorcycles, Motorcycle Enterprises, and Big Dog Motorcycles, LLC.

**B.**     **HDM Acquires Old Big Dog's Property**

---

[2] The common law marks at issue in this lawsuit are "K9," "Mastiff," "Ridgeback," "Mutt," and "Pitbull."

[3] Unless the Court refers to Wichita Motorcycles or Motorcycle Enterprises individually, the entities will be referred to together as the "Old Big Dog entities."

HDM is a long-time parts supplier of "Big Dog" branded parts and accessories.  In 2003, HDM and its principal, Derek McCloud, developed a relationship with Old Big Dog under which HDM liquidated Old Big Dog's excess inventory.  Through 2011, HDM purchased parts and accessories from Old Big Dog and resold those items, all with Old Big Dog's approval.  After Old Big Dog went out of business in 2011, HDM continued to buy Big Dog parts and accessories from the Old Big Dog entities for resale.  It also began ordering and selling newly manufactured parts and accessories, some of which bore the Big Dog Marks, with full knowledge and without objection of the Old Big Dog entities.

During the liquidation of Old Big Dog's assets, HDM was the high bidder.  On January 9, 2014, Intrust executed a Bill of Sale transferring "all right, title and interest in and to the equipment and other personal property" set forth in an attachment identified as "Exhibit A" to HDM.  HDM has not been able to produce a complete copy of Exhibit A.  The copy in existence, however, lists certain tooling necessary to make Big Dog component parts, such as "tooling for 231-000005-00 wolf seat pan" and "sm sub-weldment tooling for K9 250."  Exhibit A also lists various software licenses and other property relating to designs, such as "software licenses from BDMOC," "computer licenses in design creative suite 3," as well as computers and servers used specifically for design purposes.  HDM paid over $240,000 for the property conveyed in the January 2014 Bill of Sale.

Moore helped HDM clean out Old Big Dog's premises and remove the items described in the January 2014 Bill of Sale.  While doing so, he created copies of the Design files located on Old Big Dog's servers and computers with HDM's permission.  He later informed another Big Dog supplier that the January 2014 Bill of Sale is "proof-of-ownership for the 'Big Dog tooling.' "

**C.      Assignment of the Big Dog Marks to MNM**

Motorcycle Enterprises and Wichita Motorcycles executed a Quit Claim Bill of Sale on October 2, 2014.  The Quit Claim states that Motorcycle Enterprises and Wichita Motorcycles "sell, transfer, and quit claim" to Intrust all of their right, title, and interest in the following property:

> All inventory, equipment, accounts (including but not limited to all healthcare insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of creditor, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

It further states that Motorcycle Enterprises and Wichita Motorcycles agree to deliver to Intrust the documents necessary to complete the conveyance of the property described above, including but not limited to:

> (i) trademarks, service marks, trade names, logos, and product names and the goodwill of the business associated therewith, (ii) the copyrights, copyright applications, and copyright registrations associated therewith, (iii) the patents and patent applications associated therewith; (iv) all other intellectual property, used or useful in accordance with or relating to the businesses of Motorcycle Enterprises, LLC and Wichita Motorcycles, LLC; and (v) all contracts, instruments, drawings, engineering, source and access codes and other documentation relating to the foregoing.

On November 13, 2014, Wichita Motorcycles and Intrust executed two identical conveyances titled "Assignment of Mark," except that one conveyance was for the "BDM"

trademark and the other was for the "Big Dog Motorcycles" trademark.[4]  The conveyances state

that Wichita Motorcycles "ratifies, confirms, and acknowledges the assignment" of the Marks to

Intrust pursuant to the October 2014 Quit Claim.  The conveyances then assigned Intrust's right,

title, and interest in those marks, together with the goodwill of the business, to MNM.

Less than a week later, on November 17, Intrust and MNM executed a "Quit Claim

Assignment and Assumption of Intellectual Property."  This conveyance assigned all of Old Big

Dog's remaining intellectual and intangible property then held by Intrust to MNM.  MNM paid

$15,000 for the rights to the intellectual and intangible property.

On November 15, 2015, MNM filed a trademark application seeking registration of the

"Big Dog" logo mark, which was later registered on December 19, 2017.

## D.    HDM's Use of the Big Dog Marks and Designs from 2014 to 2018

From 2014 to 2018, HDM continued to sell Big Dog parts and accessories that were either

purchased in liquidation from Old Big Dog in 2014 or newly manufactured, with MNM's

knowledge and approval.  MNM alleges that HDM sold these parts and accessories under a license

granted by MNM.  Moore allegedly sent HDM a copy of a License Agreement, which granted

HDM the right to use the Big Dog Marks and "the Design Information," as that term is defined in

the Agreement,[5] in connection with the sale of parts, accessories, collectibles, and apparel.

---

[4] The "BDM" registration should have been assigned from Motorcycle Enterprises, and not Wichita Motorcycles, to Intrust.  Intrust realized this mistake and executed a corrected "Assignment of Mark" on December 1, 2014.

[5] The License Agreement defines "Design Information" as:

any and all information (whether conveyed orally or in writing) about design and engineering specifications, directions, processes, and procedures, including without limitation, trade secrets, designs, diagrams, technology, ideas, know-how, services, models, processes, data, techniques, improvements, inventions (whether patentable or not), business and product development plans or other information of [MNM] that is used or useful in connection with the assembly, manufacture or

MNM has not produced a fully executed copy of the License Agreement. Notwithstanding this fact, MNM asserts that the License Agreement was accepted by HDM's conduct. In December 2014, HDM attempted to purchase motorcycle covers bearing the Big Dog logo from a vendor called Covercraft. When Covercraft requested proof of HDM's right to manufacture or sell Big Dog branded goods, Moore sent an email to Covercraft attaching an unsigned copy of the License Agreement. Moore copied HDM's principal, Derek McCloud, on the email. When McCloud received the email, he opened the License Agreement and read a portion of it. HDM subsequently ordered trademarked goods from Covercraft.

When other manufacturers asked HDM to submit proof of its right to use the Big Dog Marks, HDM did not provide the License Agreement but rather an authorization letter authored by Moore. That letter stated that MNM was the owner and had the "absolute right to the intellectual property and tooling associated with the Big Dog Motorcycles and BDM Performance Products tradenames." It also identified the following companies and agents "authorized to conduct business with your company under the terms of this agreement:"

> MNM Investments: (Licensor; Big Dog Motorcycles, BDM Performance Products, Kansas Motorcycle Works)
>
> Kansas Motorcycle Works: (Licensee)
>     Authorized Purchasing Agents: Matt Moore, Brandon Bastow
>
> HDM Incorporated: (Licensee)
>     Authorized Purchasing Agents: Derek McCloud, Donna McCloud

HDM also monitored the use of the Big Dog brand by other retailers. In November 2016, HDM entered into an "eBay VERO Reporting Tool Agreement" with eBay. This agreement

---

service of the Motorcycles or any parts incorporated therein, as modified, discontinued or substituted by Licensor from time to time.

allows intellectual property owners to request the removal of eBay listings containing items that infringe the owner's intellectual property rights.  In the agreement, HDM represented that "matt moore [sic]" was the owner of the intellectual property rights and that HDM was the "User" of the VERO Reporting Tool.  The agreement also identified "donna mcloud [sic]" as the agent of the "User" who was authorized to report infringing activity on behalf of HDM.

eBay is HDM's primary source of sales for Big Dog-related merchandise.  Some of the products shipped from HDM's eBay store contained HDM's business cards, which identified HDM's products as "officially licensed original registered trademarked Big Dog items."  From 2015 to the present, HDM has paid MNM a five percent royalty on newly-made apparel, merchandise, and seats bearing one of the federally registered marks—the "Big Dog" logo.  In some instances, the royalty payments were based on inventory which had not yet sold.  HDM never paid MNM a royalty in connection with its sale of parts or liquidation items.

From 2015 to 2018, HDM also ordered Big Dog Motorcycle parts that were manufactured using the Designs but did not bear the Big Dog Marks.  The vendors who manufactured those parts included QTM Brembo, Zodiac Enterprises of Taiwan, Elecsys, and Millennium Machine and Tool ("Millennium").  Each of these suppliers previously executed "Supplier Confidentiality" and/or "Purchase Agreements" with Old Big Dog that required the suppliers to maintain the confidentiality of Old Big Dog's confidential information and protect it from disclosure to third parties.  MNM alleges that the Designs were protected under these agreements, and that MNM acquired the right to use and protect the Designs under Old Big Dog's agreements as part of the assets Intrust conveyed to MNM in November 2014.

E.      **MNM's Alleged Interference and the Break Down of MNM and HDM's Relationship**

In early January 2018, MNM told QTM Brembo, Zodiac Enterprises of Taiwan, Elecsys, and Millennium that HDM did not have the right to manufacture parts or accessories using the Designs. HDM and MNM's business relationship subsequently collapsed. On June 8, 2018, Moore sent HDM an email stating, "As you probably recall, your license to use Big Dog IP expired in December."

HDM continues to manufacture Big Dog parts using the Designs through its supplier Millennium. Millennium was an original supplier to Old Big Dog. When Old Big Dog breached its payment obligations to Millennium, Millennium filed a state court lawsuit. In an email exchange between the parties' counsel in that lawsuit, Millennium agreed to dismiss its claim in part because Old Big Dog agreed that Millenium could manufacture Big Dog parts and accessories for any third party using Millennium's tooling and technology. Old Big Dog took the position that Millennium was "free to proceed as it sees fit" in this respect. MNM has never indicated to Millennium that it is prohibited from making Big Dog Motorcycles parts for third parties or asserted to Millennium that it owns intellectual property rights in the Designs.

F.      **This Litigation**

MNM filed suit in September 2018. MNM asserts that HDM, upon being sued, cleaned up its eBay storefronts or landing pages and many of its eBay listings that presented the Big Dog Marks in an infringing manner. MNM also asserts that HDM did not make copies or take any action to preserve the infringing evidence it removed from eBay despite its knowledge of the pending lawsuit.

MNM asserts claims of trademark infringement, trademark counterfeiting, and breach of contract. HDM asserts counterclaims of tortious interference with prospective business relations,

declaratory judgment concerning the manufacture and sale of Big Dog parts and accessories using the Designs, and declaratory judgment concerning noninfringement of marks.  HDM contends that if it is not allowed to use the equipment it purchased from Old Big Dog for its intended purpose, namely the manufacture of Big Dog parts and accessories, it is valueless.

In its first motion for partial summary judgment, MNM asked the Court to rule on the question of ownership of two Registered Marks—"Big Dog Motorcycles" and "BDM."  The Court ruled that the October 2014 Quit Claim Bill of Sale effectively transferred ownership of the Registered Marks from Motorcycle Enterprises and Wichita Motorcycles to Intrust.  The Court further found that because HDM did not otherwise fault the chain of title passing those marks to MNM, "the conveyances . . . transferred title in the [Registered Marks] to MNM."

MNM now moves the Court for partial summary judgment on the ownership of the Big Dog Marks.  It also asks the Court to grant summary judgment on HDM's counterclaim seeking a declaratory judgment that HDM has the right to manufacture and sell Big Dog parts and accessories using the Designs and HDM's counterclaim for tortious interference with prospective business relations.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7]  The movant bears

---

[6] Fed. R. Civ. P. 56(a).

[7] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

the initial burden of proof and must show the lack of evidence on an essential element of the claim.[8]

If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must

instead "set forth specific facts" that would be admissible in evidence in the event of trial from

which a rational trier of fact could find for the nonmovant.[9] These facts must be clearly identified

through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone

cannot survive a motion for summary judgment.[10] The Court views all evidence and reasonable

inferences in the light most favorable to the party opposing summary judgment.[11]

### III.    Analysis

### A.    Ownership of the Big Dog Marks

MNM asks the Court to conclude as a matter of law that it is the owner of the Big Dog

Marks.   According to MNM, this conclusion requires the Court to find (1) that the 2014

conveyances transferred the Common Law Marks to MNM and (2) that HDM has always been a

licensee or reseller of the Big Dog Marks and thus has not acquired any proprietary rights in them.

As to the first issue, MNM relies on this Court's prior Order granting in part MNM's first

motion for partial summary judgment.   In that Order, the Court concluded that the conveyances

between  Wichita  Motorcycles,  Motorcycles  Enterprises,  and  Intrust  and  the  subsequent

conveyances between Intrust and MNM effectively transferred ownership of the Registered Marks

to  MNM.   In  its  current  motion,  MNM  argues  that  the  same  conveyances  also  transferred

---

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[9] *Id.* (citing Fed. R. Civ. P. 56(e)).

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

ownership of the Common Law Marks to MNM.  HDM concedes in its response that based on the Court's conclusions in the prior Order, the 2014 conveyances transferred common law rights in the Common Law Marks to MNM.  Therefore, the Court concludes that the 2014 conveyances transferred ownership of the Common Law Marks to MNM.

As to the second issue, MNM argues that because HDM did not obtain any intervening or superior rights in the Big Dog Marks from 2003 to 2018, it is the outright owner of the Marks. According to MNM, from 2003 to 2014, HDM was only a reseller of branded merchandise, and thus, HDM's use of the Big Dog Marks falls under the first sale doctrine.  Under the first sale doctrine, a distributor who resells trademarked products without change is not an infringer and thus needs no license.[12]  The reseller acquires no rights in the trademarks as the goodwill associated with the mark has been exhausted with the original owner's first sale of the goods to the reseller.[13] Thus, MNM argues that HDM did not obtain any superior rights in the Big Dog Marks from 2003 to 2014.

HDM did respond to this argument in its opposition brief.  The Court, however, cannot grant MNM summary judgment on this issue because there is a genuine issue of material fact regarding whether HDM was *solely* a reseller of Big Dog branded goods from 2003 to 2014. McCloud, HDM's principal, stated in his declaration that beginning in 2011, HDM began ordering and selling newly manufactured parts and accessories, some of which featured the Big Dog Marks

---

[12] 4 McCarthy on Trademarks and Unfair Competition § 25:41 (5th ed.); *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009) ("Those who resell genuine trademarked products are generally not liable for trademark infringement.").  There is an exception to this rule, which is not relevant to this case. A reseller may be liable for infringement when the reseller "sells trademarked goods that are materially different than those sold by the trademark owner."  *Beltronics*, 562 F.3d at 1072 (internal quotation marks and citation omitted).

[13] *See generally* 4 McCarthy on Trademarks and Unfair Competition § 25:41.

with Old Big Dog's knowledge and permission.  The sale of these parts and accessories would not

fall under the first sale doctrine.

MNM next argues that HDM did not obtain any rights in the Big Dog Marks from 2014 to

2018, because during that time period, HDM acted as an implied licensee and not as the owner of

the Marks.[14]  The licensee of a trademark, whether express or implied, obtains no rights in the

mark.[15]

Here, there is a genuine issue of material fact as to whether there was an implied license

between the parties from 2014 to 2018.  An implied license "arises out of the objective conduct of

the parties, which a reasonable person would regard as indicating that an agreement has been

reached."[16]  Licenses are contracts "governed by ordinary principles of state contract law."[17]  In

Kansas, the "intent of the contracting parties is normally a question of fact for the jury, and

determination of whether there is an implied contract . . . requires a factual inquiry."[18]

In its first summary judgment Order, the Court concluded that there was a genuine issue of

material fact regarding whether HDM had an implied license to use the Registered Marks.  The

Court reiterates its conclusion in this Order.  McCloud's declaration states that MNM was aware

of HDM's sale of products bearing the Registered Marks from 2014 to 2018 and that MNM failed

---

[14] MNM also asserts in this litigation that the parties' relationship from 2014 to 2018 was governed by the written License Agreement.  But MNM stipulates for purposes of its motion that HDM did not accept the written License Agreement.

[15] 3 McCarthy on Trademarks and Unfair Competition § 18:52 (5th ed.) ("A licensee's use inures to the benefit of the licensor-owner of the mark and the licensee acquires no ownership rights in the mark itself.").

[16] *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000) (internal quotation marks and citation omitted).

[17] *Power Lift, Inc. v. Weatherford Nipple-Up Systems, Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989).

[18] *Frye v. IBP, Inc.*, 15 F. Supp. 2d 1032, 1044 (D. Kan. 1998) (citing *Boyd v. Doskocil Sausage Co.*, 686 F. Supp. 875, 877 (D. Kan. 1988)).

to exercise quality control over HDM's use of such marks.  This evidence creates a genuine issue of material fact as to whether HDM had an implied license to use the Registered Marks.

As to the Common Law Marks, when viewed in the light most favorable to HDM, the evidence is sparse as to the existence of an implied license.  HDM did not pay MNM a royalty for its use of the Common Law Marks.  According to the letter to MNM outlining HDM's royalty payments, HDM only paid MNM a royalty on merchandise bearing the "Big Dog logo."  In addition, the authorization letter that MNM sent to HDM's manufacturers did not identify the Common Law Marks as part of MNM's intellectual property.  Nor did the VERO agreement. Accordingly, there is a genuine issue of material fact as to whether HDM had an implied license to use the Common Law Marks.

Finally, MNM asks the Court to consider HDM's destruction of certain eBay evidence as unfavorable to HDM on the implied license issue.  HDM testified that after being sued it "cleaned up" its eBay store by deleting any use of the Big Dog Marks it believed could be viewed by MNM as evidence of infringement.  It made no copies of what its eBay store looked like prior to being sued.  MNM argues that this conduct amounts to bad faith spoliation and asks the Court to presume that this evidence was unfavorable to HDM.

The Court declines to impose sanctions on HDM at this point in the litigation.  Although the eBay evidence may be relevant to MNM's infringement allegations, MNM has not explained, and the Court cannot discern, its relevance to the implied license issue.  Furthermore, MNM's argument has not been fully developed by the parties either factually or legally, and the Court will not impose sanctions in the absence of such information.

In sum, the Court grants MNM's motion to the extent it finds that the 2014 conveyances transferred ownership in the Common Law Marks to MNM.  The Court denies MNM's motion to

the extent it asks the Court to declare that MNM had superior rights in the Big Dog Marks from 2003 to 2014.

 **B.**   **HDM's counterclaim for declaratory judgment as to HDM's right to manufacture parts and accessories**

MNM next seeks summary judgment on HDM's counterclaim for declaratory judgment as to HDM's right to manufacture parts and accessories using the Designs.  HDM contends that it acquired proprietary rights to the Designs from Intrust pursuant to the January 2014 Bill of Sale and thus has the right to have parts manufactured using the Designs.  MNM, on the other hand, asserts that it acquired the Designs and all other intellectual property owned by Old Big Dog pursuant to the October 2014 conveyances from Motorcycle Enterprises and Wichita Motorcycles to Intrust and the November 2014 conveyance from Intrust to MNM.  According to MNM, the Designs were protected under Old Big Dog's written agreements with its parts manufacturers or suppliers, and MNM acquired Old Big Dog's rights under these agreements in the November 2014 conveyance.

In response to MNM's motion, HDM asserts that there are disputed issues of material fact as to whether the January 2014 Bill of Sale conveyed the Designs to HDM.  That conveyance states that Intrust conveys to HDM:  "all right, title and interest in and to the equipment and other personal property described on Exhibit 'A' attached hereto and incorporated by reference, currently located in the Motorcycle Enterprises facilities."  According to HDM, there is a factual dispute as to whether the Designs were conveyed based on the property identified in Exhibit A. First, HDM points to the items of tooling listed on Exhibit A, which note by design and part number the particular designs and parts to which the tooling is directed.  For example, Exhibit A lists "tooling for 231-000005-00 wolf seat pan," "sm sub-weldment tooling for K9 250," and "tooling

charge for 200-00040800 2010/2011 chopper rear fender."  Second, HDM asserts that Exhibit A identifies computers and servers that housed the Designs for particular parts and accessories.  And third, HDM points to licenses for certain design software such as "corel draw 1.0" and a computer used specifically for design-related purposes.

HDM's alleged ownership of the Designs is resolved by interpreting the January 2014 Bill of Sale.[19]  The initial question of contract interpretation is a question of law for the Court.[20]  In interpreting a written contract, the primary rule is to determine the parties' intent.[21]  If the contract's terms are clear, the Court determines the intent of the parties from the language of the without applying the rules of construction.[22]  If the contract is ambiguous, however, and the intent of the parties is disputed, a genuine issue of material fact exists which cannot be determined by the Court.[23]  "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[24]

The Court agrees with HDM that the language of the January 2014 Bill of Sale is ambiguous.  Specifically, the conveyance of all "right, title and interest" in and to certain

---

[19] There appears to be a lapse in the timeline as to how Intrust acquired title in the assets sold in the January 2014 Bill of Sale. On April 6, 2011, Intrust conveyed Old Big Dog's assets to Wichita Motorcycles and Motorcycle Enterprises.  The parties have not identified any conveyance or other transaction in which Intrust would have re-acquired that property from these entities.  The parties have not raised this issue in their briefs, and therefore the Court will not address it here.  However, for HDM to succeed on its declaratory judgment counterclaim at trial, it must show that Intrust acquired the right to convey the assets pursuant to the January 2014 Bill of Sale.

[20] *Wagnon v. Slawson Expl. Co., Inc.*, 255 Kan. 500, 874 P.2d 659, 666 (1992) (citation omitted).

[21] *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250, 264 (2013) (citations omitted).

[22] *Id*.

[23] *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1215 (10th Cir. 2009).

[24] *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 732 P.2d 741, 746 (1987).

computers and servers listed on Exhibit A creates doubtful or conflicting meaning as to whether the Designs were also conveyed to HDM.  The Court also concludes that the language of the Bill of Sale is conflicting as to whether Exhibit A's reference to the tooling, which identifies a specific design and part number, implicates HDM's right to use that tooling for its intended purpose—the manufacture of Big Dog parts and accessories—and thus, creates ambiguity in the language of the contract.

MNM argues that the conveyance of computers and servers containing the Designs does not create ambiguity in the contract because ownership of an object or medium subject to another's proprietary rights arising out of contract does not transfer those rights themselves.  But, the cases MNM relies on address the transfer of copyrights in an underlying work.[25]  MNM does not assert copyright protection in the Designs, only rights arising out of Old Big Dog's contracts with third parties.  Furthermore, even if the Court were to consider copyright law as instructive on this issue, the federal courts have varying requirements as to what formal words of conveyance are required to unambiguously transfer ownership in a copyright when a tangible object is conveyed from one party to another.[26]

MNM also argues that the January 2014 Bill of Sale should be read in conjunction with the November 2014 conveyance from Intrust to MNM, and that when these conveyances are read

---

[25] *See Relational Design & Tech., Inc. v. Brock*, 1993 WL 191323, at *6 (D. Kan. 1993) (concluding that the transfer of "all rights to the completed program with no licensing or royalties fees due" included copyright but ultimately finding contract to be ambiguous based on another provision int eh contract); *Gener-Villar v. Adcom Grp., Inc.*, 417 F.3d 201, 203 n.1 (1st Cir. 2005) (addressing copyright dispute between the parties).

[26] *See Relational Design*, 1993 WL 191323, at *6; *Friedman v. Stacey Data Processing Servs., Inc.*, 1990 WL 172586, at *3, *5 (N.D. Ill. 1990) (contract stating that plaintiff owned the software programs "in their entirety" was ambiguous as to whether it included copyright); *Shugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 285-86 (S.D.N.Y. 1997) (finding that the language "all right, title and interest" included a transfer of the copyright because "[n]o exception was carved out for copyrights" and "no rights, titles, or interests were retained.").

together, it is clear that Intrust intended to convey the Designs to MNM and not HDM.  In support of this argument, MNM relies on an adjunct rule of contract interpretation not yet addressed in this case:

> [W]here two or more instruments are executed by the same parties contemporaneously, or even at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties, although they do not in terms refer to each other.[27]

MNM argues that the two conveyances from Intrust are part of the same transaction because they both involve the conveyance of property from Intrust related to its foreclosure on Old Big Dog's loans.

The Court is not persuaded that this rule of contract interpretation applies here.  The rule requires the parties to the contracts to be the same, and the parties to the January 2014 Bill of Sale and the November 2014 conveyance are not.  Although Intrust was the seller in both contracts, HDM was the buyer in the January 2014 Bill of Sale and MNM was the buyer in the November 2014 conveyance.  Thus, the Court will not construe the documents together.

Finally, the extrinsic evidence also shows that there is a genuine issue of material fact as to whether Intrust intended to convey the Designs pursuant to the January 2014 Bill of Sale.  Under Kansas law, "[i]f a contract is ambiguous, a court can consider evidence other than the agreement itself."[28]  When Moore helped HDM clean out Old Big Dog's premises and remove the items HDM acquired in the sale, he downloaded the Design files located on Old Big Dog's servers.  In

---

[27] *West v. Prairie State Bank*, 200 Kan. 263, 436 P.2d 402, 405 (1968); *see also Hollenbeck v. Household Bank*, 250 Kan. 747, 829 P.2d 903, 906 (1992) (citing *West*, 436 P.2d at 405); *Heavy Petroleum Partners, LLC v. Atkins*, 457 F. App'x 735, 744 (10th Cir. 2012) (citing *Hollenbeck*, 829 P.2d at 906).

[28] *In re Marriage of Johnston*, 54 Kan. App. 2d 516, 402 P.3d 570, 579 (2017).

its statement of uncontroverted facts, MNM states that Moore took this action with Old Big Dog's "permission." Thus, when read in the light most favorable to HDM, this is a recognition of HDM's rights in the Designs. In its reply brief, MNM attempts to back off its use of the word "permission" and states that the term only meant that HDM did not object to Moore's downloading of the Designs. The testimony cited by MNM is vague as to whether Moore obtained express permission to download the Designs or whether McCloud was simply aware that he was downloading them. However, McCloud did testify that he thought Moore, who was helping HDM transfer the liquidated items from Old Big Dog's premises to another location, was in charge of transferring the "valuable information." Thus, this suggests that Moore was simply helping HDM to transfer the property it acquired in the Bill of Sale, which included the Designs—not that Moore was taking possession of the Designs under some right of ownership. Other extrinsic evidence suggesting that Intrust intended to convey the Designs to HDM includes McCloud's testimony that HDM acquired hard copies of the Designs in the files he acquired in the sale and his testimony that if HDM is not able to use the equipment for its intended purpose—the manufacture of Big Dog parts and accessories—it is valueless to HDM.

Overall, genuine issues of material fact exist as to whether HDM acquired rights in the Designs through the January 2014 Bill of Sale. Based on this conclusion, the Court sees no need to address MNM's assertion that it acquired the Designs from Intrust in November 2014. The Court denies MNM's motion for summary judgment as to HDM's counterclaim for declaration as to the right to manufacture parts and accessories.

## C.    HDM's Tortious Interference Claim

HDM asserts a counterclaim for tortious interference with prospective business relationship with four parts suppliers or manufacturers: QTM Brembo, Zodiac Enterprises of

Taiwan, Elecsys, and HDM's main supplier, Millenium Machine and Tool.  To succeed on a claim for tortious interference with a prospective business advantage under Kansas law,[29] a plaintiff must show (1) a business relationship or expectancy with probable future economic benefit to the plaintiff, (2) the defendant knew of the relationship or expectancy, (3) but for the defendant's conduct, the plaintiff was reasonably certain to have continued the relationship or realized the expectancy, (4) the defendant engaged in intentional misconduct, and (5) the plaintiff sustained direct and proximate damage.[30]

The tortfeasor's misconduct must be "predicated on malicious conduct."[31]  This burden becomes heavier when the alleged wrongdoer is a competitor.  In this situation, the Tenth Circuit has interpreted the "intentional misconduct" element to require "independently actionable conduct."[32]  "Independently actionable conduct" is conduct that is "intrinsically wrongful—that is, conduct which is itself capable of forming the basis of liability of the actor."[33]  The alleged conduct must relate to " 'physical violence, fraud, civil suits, and criminal prosecutions.' "[34]

Here, HDM's claim is predicated on the allegation that Moore told HDM's parts suppliers that HDM did not have the right to manufacture Big Dog-related parts and accessories using

---

[29] In Kansas, the law of the state where plaintiffs felt the wrong governs tortious interference claims. *Snyder v. Am. Kennel Club*, 661 F. Supp. 2d 1219, 1230 (D. Kan. 2009), *aff'd*, 402 F. App'x 397 (10th Cir. 2010). Here, the parties agree that Kansas law applies.

[30] *Pipeline Prods., Inc. v. Madison Cos., LLC*, 428 F. Supp. 3d 591, 605 (D. Kan. 2019) (applying Kansas law and citing *Byers v. Snyder*, 44 Kan. App. 2d 380, 237 P.3d 1258, 1269 (2010)).

[31] *Burcham v Unison Bancorp., Inc.*, 276 Kan. 393, 424-25, 77 P.3d 130, 151 (2003) (citation omitted).

[32] *Util. Trailer Sales of Kan. City, Inc. v. MAC Trailer, Mfg., Inc.*, 734 F. Supp. 2d 1210, 1222 (D. Kan. 2010) (citing *DP-Tek, Inc. v. AT&T Global Info. Sols. Co.*, 100 F.3d 828, 836 (10th Cir. 1996)), *aff'd*, 443 F. App'x 337 (10th Cir. 2011)).

[33] *Id*. at 1222 (citation omitted).

[34] *Id*. (quoting *DP-Tek*, 100 F.3d at 833).

MNM's intellectual property.  HDM alleges that Moore's statements were made in May and June of 2018, which is after the parties' relationship broke down.  MNM argues that in the absence of a relationship, MNM and HDM were competitors and thus the more stringent test for determining if MNM acted with the requisite intent applies.  In the alternative, MNM argues that HDM cannot show the less stringent standard of actual malice applies because Moore acted in good faith.

The Court declines to apply the more stringent standard requiring "independently actionable conduct" at this time.  Although MNM argues that the parties were competitors at the time Moore's statements were made, it has not offered any evidence supporting this argument.  Thus, the Court finds that there is a genuine issue of material fact as to whether MNM and HDM were competitors at the time of Moore's statements.

Turning to the less stringent standard—whether Moore's statements amount to intentional misconduct—MNM argues that HDM cannot meet this element of its claim because Moore's statements were made in good faith.  MNM does not cite any Kansas case law that specifically recognizes good faith conduct as a defense to a tortious interference claim.[35]  The Kansas Supreme Court, however, has held that a party may be privileged or justified to interfere with contractual relations in certain situations.[36]  The term "justification" is "not [ ] susceptible of any precise definition.  It is employed to denote the presence of exceptional circumstances which show that no tort has been in fact committed and to connote lawful excuse which excludes actual or legal

---

[35] MNM cites *Rocky Mountain Biologicals, Inc. v. Microbix Biosystems, Inc.*, 986 F. Supp. 2d 1187, 1200 (D. Mont. 2013) and *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 599 F. Supp. 2d 809, 846 (S.D. Tex. 2008), *aff'd*, 567 F.3d 754 (5th Cir. 2009).

[36] *M West, Inc. v. Oak Park Mall, LLC*, 44 Kan. App. 2d 35, 234 P.2d 833, 848 (2010) (citing *Burcham*, 77 P.3d at 152).

malice."[37]  The following factors should be considered to determine whether a defendant's conduct is improper:

> 1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties.[38]

The Kansas Supreme Court's justification rule is arguably consistent with the rationale behind a good faith exception—both recognize that a defendant's actions may be justified and thus sufficient to defeat a tortious interference claim.[39]  But, because Kansas law applies in this case, the Court will look to the factors enumerated by the Kansas Supreme Court in determining whether Moore engaged in intentional misconduct.  Finally, "[t]he issues of [a] defendant['s] motive and the presence or absence of malice are typically questions for the jury."[40]

When the facts are viewed in the light most favorable to MNM, there are issues of fact as to Moore's knowledge, intentions, and motivations in making the statements upon which HDM's tortious interference claim is based.  Moore acted as the liquidator of Old Big Dog's assets, and he facilitated the sale of Old Big Dog's tooling, equipment, computers, and other property reflected in the Bill of Sale.  Based on his role in the liquidation, Moore was aware that HDM acquired tooling, the use of which necessarily implicated use of the Designs.  He was also aware that the Designs were located on the liquidated computers because he downloaded the Designs while

---

[37] *Burcham*, 77 P.3d at 152 (citing *Turner*, 722 P.2d 1116) (internal quotations marks omitted).

[38] *Id*. (citation omitted).

[39] *Rocky Mountain Biologicals*, 986 F. Supp. 2d at 1200.

[40] *Burcham*, 77 P.3d at 152.

helping HDM remove the property from its location.  With this knowledge, Moore told HDM's suppliers that HDM could not use the property it acquired in the January 2014 Bill of Sale—rendering it worthless to HDM.  This evidence suggests that Moore knew that HDM owned the Designs and that his statements were made with the intent to harm HDM relationships with its suppliers.  Overall, Moore's conduct comes down to a question of credibility, which cannot be not resolved on summary judgment.  Therefore, MNM's motion for summary judgment on HDM's tortious interference with prospective contractual relations is denied.

### IV.    Conclusion

The Court grants in part and denies in part MNM's Motion for Partial Summary Judgment. The Court grants MNM's motion as to the issue of ownership of the Common Law Marks. Pursuant to HDM's concession in its opposition brief, the Court concludes that the 2014 conveyances transferred ownership in the Common Law Marks to MNM.  The Court denies MNM's motion to the extent it asks the Court to find that MNM is the outright owner of the Big Dog Marks.  The Court also denies MNM's motion to the extent it seeks judgment on HDM's declaratory judgment counterclaims.

**IT IS THEREFORE ORDERED** that Plaintiff's and Counterclaim Defendants' Motion for Partial Summary Judgment (Doc. 161) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 7th day of May, 2021.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE